COUNTY BOARD OF SCHOOL TRUSTEES OF DU PAGE COUNTY *ex rel.* HINSDALE TOWNSHIP HIGH SCHOOL DISTRICT NO. 86, Plaintiff-Appellee, *v.* AN ASSOCIATION OF FRANCISCAN FATHERS OF THE STATE OF ILLINOIS, Defendant-Appellant.—AN ASSOCIATION OF FRANCISCAN FATHERS OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* HINSDALE TOWNSHIP HIGH SCHOOL DISTRICT NO. 86 *et al.*, Defendants-Appellees.

Second District   Nos. 76-19, 76-20 cons.

Opinion filed June 17, 1977.—Rehearing denied July 20, 1977.

James D. Murphy, Jr., of Chicago, for appellant.

William C. Murphy and P. Scott Courtin, both of Reid, Ochsenschlager, Murphy & Hupp, of Aurora, for appellee.

John J. Bowman, State's Attorney, of Wheaton (Malcolm F. Smith and Joseph E. Bonk, Assistant State's Attorneys, of counsel), for appellee.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

An Association of Franciscan Fathers of the State of Illinois (hereinafter Franciscans) appeals from a judgment denying its petition for relief under section 72 of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 72) (No. 76—19), and from a judgment dismissing its complaint for equitable relief from an alleged excessive taking (No. 76—20). We have consolidated the appeals for opinion.

The dispute involves eminent domain proceedings filed in 1968 to acquire a parcel of property in the *northern* part of the Franciscans' 400-acre tract for the use of Hinsdale Township High School District No. 86 as a prospective additional high school site; the decision of the board of District 86 in 1974 to sell the same parcel; and the acquisition by Community Unit District 201, formed after 1968 of a parcel for use as a high school site in the *southern* portion of the Franciscans' property.

The original condemnation suit was filed on May 14, 1967. The Franciscans' traverse and motion to dismiss were denied on September 19, 1968, and the defendant filed an answer and cross-petition. Thereafter, the Franciscans filed supplemental interrogatories. In particular issue are Interrogatories 7, 8 and 9:

"INTERROGATORY NO. 7. Has Dr. Robert Ireland, during his tenure as superintendent of School District No. 86, petitioner herein, expressed in writing any opinion as to the necessity or want of necessity of taking this particular property.

INTERROGATORY NO. 8. If there has been any such expression by the said Dr. Robert Ireland, set forth:

(a) When it was made and where it was made and attach the statement itself if it be in a letter or the minutes of any School Board meeting embracing it.

INTERROGATORY NO. 9. If the said Dr. Robert Ireland made such an expression concerning the foregoing, state in whose possession the document is at the present time giving the name and present address of that person."

The petitioner objected to Interrogatory 7 on the ground that Dr. Ireland's opinion as to the necessity or want of necessity of taking had already been disposed of in the court's ruling on the traverse and motion to dismiss. On the Franciscans' motion an order directing the petitioner to answer Interrogatories 7, 8 and 9 was entered on September 8, 1969. Petitioner on September 19, 1969, answered Interrogatory 7 "No." (Dr. Ireland had resigned on June 30, 1969, and the answer was made by the assistant superintendent of schools.)

There was a trial on the merits of the petition to condemn, the jury failed to agree, and a mistrial was declared on November 4, 1969.

On March 12, 1970, the Franciscans filed a motion seeking the production of "Hinsdale High School District No. 86 report entitled 'School Plant Planning' which was prepared by Superintendent Robert Ireland and the administrative staff of the School District and was presented to the Board at a public meeting in March 1969." The motion to produce was continued to March 16, 1970. On March 24, 1970, a judgment order in the nature of a consent judgment was entered in the condemnation action which included a waiver of the right of appeal and a

provision for installment payments. The site purchased was approved in a District 86 referendum on April 10, 1971. It appears from the record that the motion to produce the 1969 "School Plant Planning"; report (hereinafter the "Ireland Report") was never ruled on by the trial court in the condemnation suit.

The Franciscans received and accepted final payment on July 15, 1971, and a final order vesting "fee simple title" in the County Board of School Trustees was entered on July 16, 1971.

On January 19, 1973, Community Unit District 201 filed a condemnation suit for the acquisition of a parcel of property in the *southern* part of the Franciscans' tract for a high school site. The condemnation petition was dismissed on April 6, 1973, and the Franciscans by agreement conveyed title of that tract to District 201. On July 16, 1974, the Board of District 86 passed a resolution to sell the northern site, but postponed the sale pending the disposition of this litigation.

The trial court entered judgment in favor of the County Board of School Trustees of Du Page County and against the Franciscans on November 3, 1975, denying the section 72 relief. On the same day the court ordered the chancery action dismissed for want of equity.

## The Section 72 Proceedings (No. 76—19)

The section 72 petition proceeds on three general theories: (1) In the original condemnation action the condemnors fraudulently concealed evidence which would have supported the allegations in defendant's traverse and motion to dismiss that the property sought to be acquired was not necessary or convenient for the purposes for which it was sought to be taken and also that there was an excessive amount of property to be taken;[1] (2) prior to the making of the final payment pursuant to the judgment order in the condemnation suit, the condemnors were aware of plans to form Community Unit District 201, could be charged with knowledge that those forming 201 discussed with the Franciscans the possibility of trading the site already condemned by District 86 for a site in the southern portion of the Franciscans' property which would be more suitable for the purposes of District 201, knew that if District 201 were formed it would eliminate the need for a new high school building in the northern portion of District 86, but proceeded to make the final payment and obtain the final judgment order for the purpose of avoiding liability for Franciscans' sizable attorneys' fees; and (3) that the County Board of School Trustees of Du Page County, aware of the prior events and of the

---

[1] The evidence referred to is the Ireland Report, part of which is excerpted in an appendix to this opinion.

lack of necessity for two high school sites in the northern portion of District 86's former boundaries, while presiding over a contested hearing on division of assets between District 86 and District 201 failed to award the high school site acquired by District 86 to District 201 so that District 201 could exchange it for the site they desired in the southern portion of the Franciscans' property. In addition, in this court the Franciscans argue that an order vacating the condemnation decree under section 72 would have been proper because the District 86 Board's failure to adopt the resolution to acquire the site in an open session deprived the court of jurisdiction to hear the condemnation petition.

The section 72 petition was supported by affidavits and various documents. In addition, a hearing was had at which evidence was presented by both parties. At the hearing, Father Hegener testified for the Franciscans that they settled the original condemnation case a day or two before the second trial because they felt at the time that there was not a great deal of chance of winning the case. He also testified that when the Franciscans were first contacted by representatives of District 86, they had suggested property in their tract south of 35th Street as suitable for a high school site. Father Hegener said he was contacted in 1971 by persons who were members of both the Board of Elementary District 57 (which had substantially the same boundaries as the subsequently formed Community Unit District 201) and the "Committee of Ten" which was studying the formation of District 201. In April or May of 1971, they discussed the potential use of some of the Franciscan property as a school site for District 201. On July 14, 1971, Father Hegener met with several persons including the two board members he had spoken to earlier; James Manning, the Superintendent of District 57 and later Superintendent of District 201; and Donald Metta, who was a member of the boards of Districts 57 and 86. At this meeting the Franciscans' amenability to exchanging the northern site for a slightly smaller site south of 35th Street if 201 were formed and able to obtain the northern site in a division of assets between the district, was discussed. Father Hegener testified that he indicated that the Franciscans would be amendable to such an exchange.

Father Hegener also testified that he was not aware of the contents of Dr. Ireland's 1969 report prior to July 16, 1971. He said he first learned that it would be unlikely that District 201 would be able to obtain the northern site and exchange it for the southern site on September 28, 1972. Between the meeting in July 1971 and September 1972, he had no further formal discussions with representatives of District 57, the Committee of Ten, or District 201 concerning the proposed swap although there may have been some informal discussions in June 1972. He also testified that he had no communication with anyone from District 86 concerning the

proposed swap prior to the final payment in 1971, nor prior to the settlement of the condemnation suit brought by District 201 in 1973, excepting with Mr. Metta, whom he had met in July 1971. Father Hegener said he did have communications, however, with representatives of District 201 prior to the settlement of the condemnation suit brought by that district. The Franciscans wrote to District 86 asking for the northern site back and offering to pay the amount of the condemnation judgment on December 6, 1972, and made similar offers in March and May of 1974.

The deposition of James Manning, the former Superintendent of District 57 and present Superintendent of District 201, was incorporated into the record of the hearing. At the hearing he identified a letter to the citizens of District 57 from the Committee of Ten dated July 13, 1971, and a press release dated July 16, 1971, which both indicated that a recent District 86 referendum demonstrated that the District could not build a high school on the northern site for some time. It appeared that the Committee of Ten had decided to defer filing of its unit petition until immediately after the sale by District 86 of the bonds necessary to purchase the northern site. Manning's deposition basically substantiated the testimony of Father Hegener. However, he stated that he did not tell the Franciscans in the summer of 1972 that the representatives of District 201 had begun to feel that it would not be possible or feasible to obtain the northern site in the division of assets. Manning refused to state that the mere filing of the petition to form a unit district on July 1, 1971, or even the formation of District 201 on June 6, 1972, would destroy the need for a high school of any size on the northern site. He seemed to believe that only the formation of the proposed Oak Brook Unit District would completely destroy the need for the northern site. He also indicated that he had never discussed the possible exchange of sites with anyone from District 86 and that Mr. Metta had never told him that he had had such a discussion.

Testimony was also adduced from the following persons associated with District 86: George R. Frederick, member of the board from April 1967 to April 1973 and president of the board from April 1971 to April 1973; George A. Jones, member of the board since September 1971 and its president since April 1973; Margaret O. Coffin, member of the board since April 1973, and member of a committee to study the feasibility of retaining and building on the northern site; and Buford F. Daniels, Superintendent of the District since July 1, 1973, and associated with District 86 since 1965.

Frederick, who had been a member of the site committee of the board in 1967-68, testified that the northern site was acquired, "Definitely [for] future needs of 86." Jones, Coffin, and Daniels all agreed that several

factors, including the formation of District 201, had led to the Board's decision on July 16, 1971, to sell the northern site. They testified that although the formation of District 201 removed students from the proposed north high school's enrollment area, several other changes had occurred in the area between 1968 and 1974. There had been major low density or nonresidential developments in the northern portion of the district. Most of the population increase had occurred in the southern portion, rather than in the north as projected. In addition, a change in the birth rate appeared to be affecting elementary school enrollments. Forecasts were apparently for decreasing enrollments throughout the school system. They indicated that they had examined the population studies done in 1962 and 1968, Dr. Ireland's 1969 Report, and the Johansen Report, prepared sometime in 1971.

Mr. Jones stated that during the time he was on the board the northern site was being held for future use and that the board annually updated studies and forecasts. Mr. Fredericks and Mr. Jones indicated that the question of two large high schools or three smaller ones had been a subject of discussion among District 86 board members and in the community since 1969. Frederick testified that he had seen the Ireland Report and had participated in discussions of it. He admitted that school planning was supposed to be one of Dr. Ireland's strong points. Frederick further testified that he believed the Ireland Report was used by the board as an informational guide concerning the pros and cons of both expansion programs.

Jones testified that the questions of expanding the two existing sites and acquiring the northern site were issues in the April 1971 school board election. Donald Metta, who was opposed to both expansion and acquisition, won a seat on the board during that election. The referenda on the expansions of the two existing sites failed but the referendum on the purchase of the northern site succeeded.

Jones and Fredericks both stated that District 86 opposed the formation of District 201 and contested the division of assets. Jones testified, however, that prior to early 1974, he had never heard any discussion of the possibility of exchanging the northern site for the site ultimately acquired by District 201.

Frederick stated that prior to July 16, 1971, he was unaware that Unit District 201 was going to be formed, that Mr. Metta did not tell him that the petition was going to be filed, that he never heard any discussion about the proposed exchange, and that he did not recall any discussion of an exchange of sites during negotiations concerning the division of assets between 201 and 86 in which he participated subsequent to the formation of 201. Upon being reminded that Metta had stated in a deposition that he

had mentioned the proposed exchange to Frederick and other 86 board members informally in the fall of 1971,[2] Frederick stated he was positive he had no discussion about the exchange of property. Frederick also stated that the northern site was at no time within the territorial limits of District 201.

In his evidence deposition taken on behalf of the school board in 1975, Dr. Robert S. Ireland, former Superintendent of District 86, stated that he had prepared the document entitled, "School Plant Planning, Hinsdale Township High School District No. 86" (the "Ireland Report") dated March 1969. The report was distributed to the District No. 86 Board of Education prior to April 28, 1969, and apparently discussed at a meeting on May 12, 1969. Dr. Ireland stated that the report was not an opinion that austerity should be practiced but an opinion of what should be considered if austerity must be practiced.

In his deposition Dr. Ireland stated that as of May 14, 1968, he had an opinion that the northern site was necessary for educational purposes because there was no question at that time that a third school was necessary, requiring a third site. He stated that the northern site was desirable for educational purposes with respect to District 86, although he would have preferred a larger site. He acknowledged that his responsibility was as an advisor to the board and that the board determined the school board policy. He did not recall ever expressing an opinion that the third high school site, the northern site, was unnecessary or undesirable in 1968 or 1969. He said it was clear that at that time the need for additional school space was real, that in the long run two schools would be inadequate for District 86, and that with rising prices the sooner one obtained the land the better for the district. Responding to the intended meaning of a phrase in the report ("If funding of the school services is at stake, the acquisition of a third site must be questioned at this time."), he recalled that there had been discussion of the necessity for being economical, the loss of a referendum to increase taxes and the feeling of pessimism in terms of money issues. It was his advice that the board could consider more economical solutions if they desired to do so, and he pointed out various ways this could be done. He was stating in his report that if a priority must be set between beautiful buildings and inadequate personnel he would prefer to see a strong staff with less funds spent on construction.

In his opinion the report to the board was not a document to arrive at uspecific conclusion but was intended to present to the board an analysis of a number of alternatives that had been raised by citizens and by board members. The report was a response to concerns about the difficulty of

---

[2] According to Metta, the response was, "Well, your unit district is not going to succeed. You won't get the school built. Why should we throw away one of our options?"

obtaining funds and the necessity for being as economical and austere in planning as possible. He said there was no discussion to the effect that the Franciscan site would be bought for speculative purposes.

While he was superintendent he did not know of any proposal to form a unit district within District 57. To his knowledge district 86 did not act in concert with district 57 at any time to acquire the Franciscan Fathers' site.

On cross-examination in Dr. Ireland's deposition he was referred to a prior deposition of August, 1968. He said that the report was not underway at the time of the prior deposition although the underlying statistics could have been compiled at that time. He said that the school plant planning study was one of the last tasks he undertook to do before leaving Hinsdale and was an effort to put down as much of the background as possible for the benefit of any successor and for future planning. He stated that in 1968 prior to the filing of the petition to condemn he and the school board members appeared to be of the opinion that three high schools were desirable in the area. In March of 1969 when he prepared the report he was raising the hard question that the board had to reconsider as to whether or not they wanted two high schools or three schools. In the report he presented a cost of approximately six million dollars for a new high school and a considerably lower cost for additions to South High School and renovations of Central High School, amounting to less than three million dollars.

■■ Initially, we must decide whether the section 72 petition was filed within the two year limitations period provided in the rule.

Section 72(3) provides:

"(3) The petition must be filed not later than 2 years after the entry of the order, judgment or decree. Time during which the person seeking relief is under legal disability or duress or the ground for relief is fraudulently concealed shall be excluded in computing the period of 2 years." (Ill. Rev. Stat. 1973, ch. 110, par. 72(3).)

The petition under section 72 was filed by the Franciscans on September 19, 1974, more than two years after both the entry of the March 24, 1970, order finding just compensation and the July 16, 1971, order vesting title. The Franciscans do not claim legal disability or duress but allege that the grounds for relief under section 72, based on the allegedly false answer to Interrogatory No. 7, were fraudulently concealed from them and that they were unaware of the contents of the Ireland report until February 3, 1973, when the report was produced in the section 72 proceeding. The Franciscans argue that through "perjury" the condemnors concealed facts from the court and the defendant which, if the court had known, would have prevented the entry of the final orders.

■■ As stated in *Nogle v. Nogle*, 53 Ill. App. 2d 457, 464 (1964):

"The concealment of a cause of action which will prevent the operation of the statute of limitations must be something of an affirmative character, designed to prevent, and which does prevent, the discovery of the cause of action. Mere silence by a person liable does not amount to fraudulent concealment of the cause of action." (See also *Department of Business & Economic Development v. Pioneer Trust & Savings Bank*, 15 Ill. App. 3d 269, 276 (1973); *cf. Kammes v. Seger*, 41 Ill. App. 3d 768, 774 (1976).)

The rule that the statute begins to run only from the discovery of the fraud does not apply when the party affected might with ordinary care have discovered it. (*Nogle v. Nogle*, 53 Ill. App. 2d 457, 465. See also *Department of Business & Economic Development v. Pioneer Trust & Savings Bank*, 15 Ill. App. 3d 269, 276 (1973); *Johnson v. Hawkins*, 4 Ill. App. 3d 29, 33 (1972); *Mathews v. Atlas Liquors, Inc.*, 132 Ill. App. 2d 608, 611 (1971).) The condemnors argue that the Ireland report was not an opinion as to the necessity of the taking and that therefore the interrogatory was not answered falsely or with the intention of fraudulently concealing facts material to the necessity for the taking. While there is some basis for this argument, the more compelling answer in our view is that the Franciscans have not shown that subsequent to the alleged false answer to the interrogatory the board did anything to conceal the existence of the Ireland report except to fail to give it to the Franciscans directly until ordered to do so in the section 72 proceedings. This does not, in the circumstances before us, amount to fraudulent concealment sufficient to toll running of the statute.

The Franciscans, who claim to be affected by the alleged fraud, with ordinary diligence could have discovered it. The report was a public document which had been presented at a public meeting on May 12, 1969 (the interrogatory was filed on May 15, 1969, and answered on September 19, 1969). This was, of course, prior to the first trial of the petition to condemn in October which resulted in the mistrial on November 4, 1969. Apparently in preparation for the second trial, the Franciscans' attorney on January 16, 1970, wrote to the then attorney for District 86 stating that he would like to obtain a copy of the report, which "was presented to the Board at a public meeting in March, 1969," and further stating:

"The report was the subject of articles in the 'Suburban Life' and the other local newspapers in March of 1969 at the time of the presentation of this report. We believe this report may be relevant to the issue of the necessity or want of necessity of taking the subject property."

Thus it appears that subsequent to the filing of the answer to the interrogatory and prior to the entry of the March 24, 1970, judgment order, the Franciscans had become aware of the existence of the Ireland

report. In the exercise of ordinary diligence the Franciscans could have discovered that the report contained material which in their opinion amounted to a view by Dr. Ireland as to the necessity or want of necessity of the taking by seeking a copy from the newspapers, a copy from the school board, or pursuing the motion to produce filed March 12, 1970, after the letter of January 16, 1970, demonstrating that the Franciscans' attorney had knowledge of the existence of the report.

It is also apparent that as of January 16, 1970, the Franciscans were no longer relying upon the answer to the interrogatory in their effort to obtain evidence concerning the necessity of the taking or information as to the report itself. At no time did the board deny the existence of the Ireland report but pursued a course of action indicating that the board believed that the report did not contain any opinion by Dr. Ireland as to the necessity or want of necessity or that such opinion, which was subsequent to the traverse, was material only to an issue which could not be relitigated. Further, there is nothing in the record to indicate any attempts to obtain a copy of the report by any means between March 1970 and the time the motion to produce was filed on September 19, 1974. We therefore conclude that the trial court properly refused to grant section 72 relief based on the failure to have possession of the Ireland report prior to the entry of the March 24, 1970, judgment order on the ground that the action was barred by the two-year limitations period and by the lack of evidence of any fraudulent concealment subsequent to the Franciscans' discovery of the existence of the report.

■■ We do not thereby condone the seeming intransigence of the board and its representatives. The answer to the interrogatory was not forthright in the spirit of discovery, and what followed was not a model of open and fair dealings. We agree with the Franciscans that they were not required to presuppose that an institution such as a school board would file a false or even a misleading answer to interrogatories. However, once the Franciscans knew of the existence of the Ireland report, they were on notice that there existed a difference of opinion concerning whether the report constituted or contained an expression by Dr. Ireland on the question of necessity or want of necessity of taking, and they could no longer rely on the answer as their basis for section 72 relief. *Cf. Solt v. McDowell,* 132 Ill. App. 2d 864, 867 (1971).

The issue whether section 72 relief was barred on the second theory of the complaint proceeds on a somewhat different basis. The Franciscans claim that the condemnors knew of facts which would make the northern site unnecessary for school purposes but nevertheless completed proceedings for the taking of the site. If it is assumed that section 72 relief may be predicated on the grounds that the condemnors knew at some time prior to either March 24, 1970, or July 16, 1971, that the northern site

was not needed but proceeded to acquire it with the intention of holding it as long as possible for investment purposes, the claim would not appear to be barred. The Franciscans did not know before September 28, 1972, that it was likely that a second portion of their property would be sought by the Board of School Trustees. Further, in response to a letter asking for the return of the northern site, the Franciscans received a letter dated December 6, 1972, indicating that the property was being held in reserve for school purposes. Therefore, there appears to be no basis in the record for charging the Franciscans with a lack of diligence in discovering that the school board took fee simple title to the property knowing that it would not be needed in the future for school purposes. If it is assumed that the board took title with such knowledge, there is a positive act which could be said to have been for the purpose of preventing the Franciscans from discovering the school board's true purpose.

However, even if we assume that relief under the first theory was not barred by the two-year limitations period and further assume the application of section 72 to the second theory, we still must conclude that the judgment denying section 72 relief was not contrary to the manifest weight of the evidence.

Condemning authorities have substantial discretion to take lands sufficient not only for present needs but for future requirements which they anticipate. (*City of Waukegan v. Stanczak*, 6 Ill. 2d 594, 604 (1955).) The question of necessity for the land taken is left largely to the determination of the condemning body when the use is for the public and the court will not inquire into the amount of the property necessary for such use unless it appears that a clear abuse of the power under eminent domain is evident. *Goldman v. Moore*, 35 Ill. 2d 450, 453 (1966).

■■ The answer to the interrogatories complained of did not prevent the Franciscans from raising the defense of necessity at the hearing on the traverse. In his 1968 deposition Dr. Ireland stated that no building had been planned for the site, no architect engaged, no independent consulting firm had rendered an opinion on the necessity of the taking, and that the district had determined to take enough land to support a high school 2000 to 2500 students based on a 1962 consultant study which suggested that at some unknown date in the future the district would probably have to have three schools with enrollments of between 2000 and 2800 each. He also testified at that deposition that negotiations were proceeding to enlarge the site of Central High School. On the basis of this testimony the defense on the question of necessity could have been mounted without the excerpts from the 1969 Ireland report.

Further, the Ireland report does not seem to contradict anything the superintendent said in his 1968 deposition. The report evaluated the pros and cons of plans which could have been more economical than building

a third high school. Dr. Ireland did not, in the course of his deposition, give any opinion as to the necessity of a third high school site. The only opinions he gave were that a minimum of 40 acres would be necessary to have an adequate area for a high school with an enrollment of 2000 to 2500 students, that this site was chosen over others under consideration because of the accessibility, and that in his opinion there was nothing incompatible about having a seminary and a high school located on adjacent areas.

The claim that the school board knew before it made the final payment that the northern site would not be necessary for the present or future needs of District 86 does not support a claim for relief based on general equitable grounds under section 72.

All the persons connected with District 86 who testified or were deposed in this proceeding, except for Donald Metta who was a dual board member of District 57 and 86, denied having any knowledge of the circulation of a petition to form 201, the Committee of Ten's decision to postpone the filing of the petition, or discussions of a possible swap of property. Even assuming that the boards should be charged with the knowledge of Metta, there is no basis in the record to support a claim that the boards knew that District 201 would be formed as proposed and that it would be able to establish a high school within four years of its formation. Further, the record does not support a finding that the success of District 201 alone would obviate the need for the northern site. It appears that District 86 was opposed to the formation of District 201 and was confident that its efforts to persuade the regional superintendent not to approve the petition would be successful. Since District 86 could have used the recent acquisition of a high school site in the northern portion as an argument against granting the petition for the formation of District 201, it is doubtful that the Committee of Ten delayed filing of its own petition to aid District 86.

■■ The claim that the ultimate result was an abuse of the power of eminent domain by taking two high school sites from the Franciscans when only one was necessary is examined. This claim is based on events occurring subsequent to the final payment by District 86 resulting in the vesting of title to the northern site. The section 72 remedy is not available for relief based on matters arising subsequent to the rendition of judgment. *Russell v. Klein*, 58 Ill. 2d 20, 225 (1974).) Moreover, the record does not show that either of the boards knew that the northern site would never be used for school purposes by District 86. On this issue the Franciscans would have had to show by a preponderance of the evidence (see *McKinnon v. Yellow Cab Co.*, 31 Ill. App. 3d 316, 317 (1975)) that the County Board of School Trustees permitted the acquisition of the northern site knowing that it would never be used by District 86 for

school purposes, or that it would become unnecessary if District 201 were formed, but that it had determined to permit the acquisition of the second site for the use of 201 rather than to award the northern site to 201 in any division of assets which might occur. The record is insufficient to support any of these findings. Interdependent facts which the board could not be charged with included the community's attitude towards a third high school, whether it would approve a referendum for issue of bonds to finance it, questions of bonding power to build on the site, and whether the expansion of the two existing sites was more feasible and more economical. On the division of assets the trial judge's apparent conclusion that the failure to award the site to 201 was not based on a previously formed intention of the County Board of Trustees to acquire two high school sites when only one was necessary, is not against the manifest weight of the evidence. There is nothing in the record to indicate that the County Board did not perform its duty and independently determine that it was in the best interests of both districts as well as the underlying grade school districts to permit District 86 to retain the site.

The Franciscans also argue that they were entitled to vacation of the original condemnation judgment for voidness under subsection (6) of section 72 ("Nothing contained in this section affects any existing right to relief from a void order * * *"). The decree is void if the court lacks jurisdiction over either the subject matter or the parties to a suit. (*Filosa v. Pecora*, 18 Ill. App. 3d 123, 128 (1974).) Fraud which prevents a court from acquiring jurisdiction or merely gives it colorable jurisdiction may render a judgment void; but fraud which occurs in the proceedings of the court after jurisdiction has been obtained such as perjury, concealment and other illegal conduct does not render a judgment void so as to be subject to collateral attack. *Schwarz v. Schwarz*, 27 Ill. 2d 140, 144-45 (1963); *Wood v. First National Bank*, 383 Ill. 515, 522 (1943).

■■ The fraud claimed here is the allegedly false answer to the interrogatory accompanied by the school board's failure to furnish the Ireland Report to the Franciscans prior to 1975. This is not the type of fraud which vitiates the court's jurisdiction. *Schwarz v. Schwarz*, 27 Ill. 2d at 144.

The claim that the condemnation proceedings were not authorized by a proper resolution may, however, raise a question of jurisdiction. The resolution of the board, apparently adopted in executive session on April 22, 1968, does not appear in the record. The petition to condemn was filed on May 14, 1968, and the traverse challenged the sufficiency of the resolution. The court took testimony and other evidence on the traverse, overruled every ground advanced, and returned the exhibits to counsel. The alleged invalidity of the resolution was not relied upon in the section

72 complaint but was relied upon in a brief in support of the section 72 action.

■■ A condemnor is not required to offer in evidence the ordinance or resolution under which it is proceeding. However, the property owner has the right to have it produced, and if not forthcoming, the result may be the failure of the proceeding. (See *Goldman v. Moore*, 35 Ill. 2d 450, 453 (1966).) Since the question was raised by the Franciscans in the condemnation action and no appeal was taken from that judgment, the question of the propriety of the initiating resolution is not subject to collateral attack under Section 72. The lack of a proper ordinance goes only to the petitioner's right to condemn and does not affect the general jurisdiction of the court over the subject matter of an eminent domain proceeding. (*Chicago Housing Authority v. Berkson*, 415 Ill. 159, 161 (1953).) Therefore, the objection is waived for failure to raise it directly.

### The Equitable Action (No. 76-20)

■■ This suit was filed prior to the section 72 petition in No. 76—19, but the section 72 action proceeded first. The equitable complaint, as amended, was based upon essentially the same theories stated in the section 72 petition with some additional allegations going to the knowledge and conduct of Districts 86, 201 and the County Board of School Trustees at the time of the hearing on the petition to form District 201 and at the time of the hearing on the division of assets between the districts. The prayer of the equitable complaint was that the Board of School Trustees execute all necessary resolutions and instruments to cause the northern site to be conveyed to the Franciscans upon payment by them of the condemnation judgment of $750,000 plus interest.

Both the complaint and an amended complaint were dismissed upon the motions of the Boards, and the Franciscans have appealed.

■■ All of the matters alleged in the chancery action to have occurred prior to July 16, 1971, when title vested, were also contained in the section 72 petition. Therefore, the court's decision which we have found to be supported by evidence and not against the manifest weight of the evidence in the section 72 action that the Franciscans were not entitled to post-judgment relief applying equitable considerations, also pertains to this suit. Matters which have been decided or which could have been decided in the section 72 proceedings were not subject to relitigation or collateral attack in a hearing on the equitable complaint. See *La Salle National Bank v. County Board of School Trustees*, 61 Ill. 2d 524, 529 (1975).

Even if, under the rule in *Russell v. Klein*, 58 Ill. 2d 220, 225 (1974), questions of relief from the original judgment based on matters occurring

subsequent to the March 24, 1970, judgment order were not properly cognizable in section 72 proceedings, we agree that the allegations of the complaint based on matters which occurred between March 24, 1970, and July 16, 1971, showed a want of equity. There appears to be no authority for and no equity in the claim that the Boards should have stopped making payments pursuant to the original judgment order when they learned that a petition to form District 201 would be filed.

■■ As to matters which were alleged to have occurred subsequent to the vesting of the title in the condemnation action, the dismissal also was proper. When the Franciscans gave the Board of School Trustees full fee simple title to the northern site, they were thereafter not entitled to an injunction against the public sale of that property simply because the property had become unnecessary for school purposes. (*La Salle National Bank v. Board of School Trustees*, at 530-31.) To the extent that the claim for relief is based on the allegation that the taking of the second piece was unnecessary, it does not demonstrate reasonable diligence nor plead facts in support of the allegation that the second site was unnecessary at the time it was acquired. The complaint shows that the Franciscans did not contest the County Board's right to take the second piece in early 1973. They alleged generally that only one site was necessary at all times during this controversy and that the Board of Trustees knew that if 201 were formed, it would obviate the need for a third high school in the northern portion of District 86. The conflicting enrollment figures cited in the complaint seem to demonstrate only that the formation of District 201 would draw 550 students away from North High School's proposed enrollment of 1500, 2000 to 2800 students. There are no allegations concerning when the County Board's Trustees could be charged with knowledge that District 201 would, in fact, establish a high school in that area, which it was required to do within four years of its creation in order to remain in existence. Therefore, the allegation that the 40-acre site was unnecessary for school purposes of District 86 in 1973 appears to be a conclusion of the pleader and not the statement of facts which would support the relief sought.

The judgments in both of the appeals, Nos. 76—19 and 76—20, are therefore affirmed.

Affirmed.

GUILD and WOODWARD, JJ., concur.

## *APPENDIX*

The report by Dr. Ireland dated March, 1969, contained goals to create "the good school," various population projections, evaluation of school plants, financial data and included under "Miscellaneous Information" the following subsection:

*"Two or Three High Schools?*

The Booz, Allen & Hamilton School Building Study of 1962 suggested an ultimate enrollment in District 86 of some 7500-8000 pupils. Nothing that has occurred since that time has appeared to alter that estimate. Estimates for 1977 by various agencies range from 5200 to 6200 and no one expects the community to be fully saturated by that time.

It appears to be good business to obtain a site for a third high school in the north area as soon as possible and to hold it until the timing for construction is clear. This is the current plan and a justifyable [*sic*] one in terms of long run economy.

However, if the District must consider extensive tightening of its belt in financial matters at this time, one must question the plan for three high schools. Two schools of 3500 to 4000 are possible and, if organized properly, can serve the community well. One has only to look to New Trier for confirmation. Coupled with some form of year round operation, such plants are not wholly unreasonable to consider on present sites. It is fully understood that such a solution is not as good—will probably provide less flexibility of organization for individual learning, and will certainly provide a less pleasant atmosphere for school than can be provided on three sites with smaller buildings. But if funding of school services is at stake, then the acquisition of a third site must be questioned at this time. It is not good business to divert funds from such things as salaries, instructional services and the maintenance of reasonable pupil-teacher ratios to purchase sites or to build buildings. If one cannot [*sic*] finance both, then he should concentrate his funds on the instructional staff and services.

In this way, one saves the price of the third site, a third auditorium, swimming pool, etc. The result is not as good as it would be with three fully adequate schools, but it is better than it would be with three fine buildings and an inadequate or second rate staff."