THIRD DIVISION
 May 21, 1997

No. 1-94-2999

DANCOR INTERNATIONAL, LTD., )
 )
 Plaintiff-Appellant, )
 )
 v. ) APPEAL FROM THE CIRCUIT
 ) COURT OF COOK COUNTY
FRIEDMAN, GOLDBERG & MINTZ, )
 )
 Defendant-Appellee, )
 ) HONORABLE KATHY M.
 and ) FLANAGAN, JUDGE
 ) PRESIDING.
PAM ACCOUNTING SERVICES, INC., )
 )
 Defendant. )

 JUSTICE GORDON delivered the opinion of the court:

 Dancor International, Ltd. (Dancor), the plaintiff, takes
this interlocutory appeal from the dismissal of its accountant
malpractice action filed against Friedman, Goldberg & Mintz
(Friedman), the defendant. See 155 Ill. 2d R. 304(a). The trial 
court granted Friedman's section 2-619 motion to dismiss (735
ILCS 5/2-619 (West 1992)) finding that Dancor's lawsuit had not
been filed within the applicable statute of limitations period. 
Dancor appeals from that dismissal order and from the trial
court's denial of its motion to reconsider or vacate the
dismissal order. For the reasons discussed below, we affirm the 
dismissal.
 On March 24, 1993, Dancor filed a four-count complaint. 
Counts I and II, which were directed at defendant Friedman,
respectively alleged breach of contract and professional
negligence. Both counts were premised on Friedman's alleged
failure, as Dancor's certified public accountants during the
period of January 1987 through August 1990, to detect warehouse
fraud and embezzlement committed by Arthur Corrigan, Dancor's
minority shareholder, officer, director and employee, who
maintained Dancor's corporate books, and Linda McGuire, Dancor's
office manager and secretary. The fraud and embezzlement
allegedly occurred from 1984 through the summer of 1990; and the
amounts embezzled totaled approximately $1,279,000. Dancor
alleged in its complaint against Friedman that, Friedman was
employed to audit, monitor, and issue a report regarding all the
books, checks and records maintained in the ordinary course of
Dancor's business. Dancor further alleged, inter alia, that
Friedman failed to discover and investigate forgeries on checks
drawn on Dancor's accounts; altered amounts on checks drawn on
Dancor's accounts; discrepancies between payees listed in the
disbursement journal and the check stubs and the actual payees
and endorsers of checks; check stubs marked void but which were
actually cashed; and checks written on Dancor's accounts for
reimbursable business expenses but which were actually for
nonreimbursable personal expenses. Dancor also alleged that
Friedman failed to verify warehouse statements of inventory on
hand and negligently relied upon warehouse confirmations or
correspondence.
 On May 25, 1993, Friedman moved to dismiss Dancor's
complaint because it was not filed within the time limits of
section 13-214.2 of the Code of Civil Procedure (the Code), which
provides that actions against persons or entities registered
under the Illinois Public Accounting Act (225 ILCS 450/0.01 et
seq. (West 1994)) must be "commenced within two years from the
time the person bringing [the] action knew or should reasonably
have known of such act or omission." 735 ILCS 5/13-214.2 (West
1992). Friedman argued that Dancor knew or should have known of
Friedman's alleged acts or omissions on October 10, 1990, the
date Dancor filed its federal lawsuit against Corrigan alleging
RICO violations (Racketeer Influenced & Corrupt Organizations Act
(18 U.S.C. 1961 et seq.)), fraudulent misrepresentation, breach
of fiduciary duty and breach of contract. Friedman argued that
since Dancor's complaint was filed on May 23, 1993 rather than by
October 10, 1992, it exceeded the two-year period provided by
section 13-214.2 and thus was subject to dismissal under section
2-619(a)(5) of the Code (735 ILCS 5/2-619(a)(5) (West 1992)).
 Attached to Friedman's motion was a copy of Dancor's 1990
federal complaint against Corrigan. That complaint, which was 35
pages long, alleged 226 specific fraudulent acts by Corrigan
including inter alia use of corporate checks for personal
expenses, fictitious payees, forgeries, and altered amounts on
checks. Each of those alleged fraudulent acts contained specific
information as to the date of the check; the recorded amount and
the altered amount, where applicable; the named payee and the
actual payee; and the recorded reason for the payment and the
actual reason for the payment.
 In response to Friedman's motion, Dancor argued that
Friedman had fraudulently concealed its accounting malpractice by
failing to provide Dancor with all of Dancor's records and work
papers in August 1990 after Friedman resigned as Dancor's
accountants. See 735 ILCS 5/13-215 (West 1992) ("[i]f a person
liable to an action fraudulently conceals the cause of action,
*** the action may be commenced at any time within 5 years after
the person entitled to bring the same discovers that he or she
has a cause of action, and not afterwards"). Dancor argued that
due to Friedman's concealment of Dancor's accounting records, it
did not discover that it had a cause of action against Friedman
until August 1991 when its new accountants, Berger, Goldstein &
Company (Berger, Goldstein), received enough documentation upon
which to form their professional opinion that a viable cause of
action existed against Friedman. In support of this argument,
Dancor attached the affidavit of James A. Spear, of Berger,
Goldstein. In that affidavit Spear stated that in August 1990,
he began working on Dancor's financial statements and did not
have any of Friedman's work papers or client records. He stated
that in the fall of 1990, Friedman forwarded account analyses and
working trial balances; and that those papers did not indicate
any ground for a malpractice action. Spear also stated that, at
his direction, a letter was sent to Friedman on August 21, 1990
requesting their work sheets for the December 31, 1989 working
trial balance. Spear averred that Friedman did not send
"workpapers concerning testing of transactions and internal
control *** [which] would have revealed the failure to perform
certain tests necessary to issue a certified accounting opinion." 
He also stated that Friedman did not comply with a subsequent
request to turn over the remainder of its papers on January 16,
1991. Spear averred that in June, July and August 1991,
additional papers were forthcoming through various sources,
including the DuPage County State's Attorney who was
investigating Corrigan. He concluded by stating:
 "*** the earliest that I was able to form any
 professional opinion, based upon local accounting
 standards, as to the existence of a possible viable
 cause of action against [Friedman] for accounting
 malpractice was August, 1991, when I received papers
 necessary to evaluate possible litigation against
 [Friedman] on accounting malpractice."
 Friedman in reply reargued that on October 10, 1990, when
Dancor filed its federal action against Corrigan, Dancor knew or
should have known of Friedman's failure to discover Corrigan's
alleged fraudulent activities and that Friedman's failure to do
so served as the basis for a potential cause of action for
professional negligence. Friedman also denied that it refused to
promptly provide accounting records to Dancor, contending instead
that it "produced all of the documents plaintiff was entitled to
by December 5, 1990." In support of that contention, Friedman
attached the affidavit of John Kallergis, a partner with the
Friedman firm. Kallergis stated that prior to Friedman's
resignation, it had provided Dancor with "audited financial
statements, unaudited financial statements for fiscal year ended
February 28, 1987 and our 1987 inventory analysis *** at the time
they were prepared." Kallergis also stated that as of December
5, 1990, pursuant to a deposition subpoena filed in Dancor's
federal action against Corrigan, he produced the following
documents to Dancor: Dancor's internal work papers; adjusting
journal entries prepared by Dancor and any adjusting journal
entries prepared by Friedman; Dancor's financial statement
prepared by Dancor and Friedman; Dancor's corporation and pension
plan income tax returns prepared by Friedman; and individual
income tax returns for Daniel Frawley and Arthur Corrigan,
principals of Dancor, prepared by Friedman. Kallergis further
averred in pertinent part as follows:
 "4. Pursuant to my understanding of the Court's ruling
 at the time, I did not produce Friedman, Goldberg &
 Mintz's audit procedures, checklists and internal
 memoranda. Additionally, I 'whited out' Friedman,
 Goldberg & Mintz's notes written in the margins of
 various documents prepared by others. *** In other
 words, I did not produce our internal notes and
 conclusions relating to Dancor's internal books and
 records. All of Dancor's workpapers [sic], however,
 with our notes deleted, were produced.
 5. I did not withhold any documents which I
 understand [sic] to be the property of Dancor."
 On September 17, 1993, the trial court granted Friedman's
motion to dismiss. The court found that the information Dancor
had in its possession on October 10, 1990, which enabled it to
file a 35-page civil federal RICO lawsuit against Corrigan
alleging 226 separate fraudulent check transactions, was enough
to put Dancor on notice of a potential claim against Friedman.
 Dancor filed its motion to reconsider or, in the
alternative, to clarify the order of September 17, 1993. Dancor
argued that although it was aware that it had suffered an injury
on October 10, 1990, it did not know at that time and reasonably
should not have known until August 1991 that the injury was
wrongfully caused by Friedman. In the alternative, Dancor argued
that the statute of limitations should not be applied to preclude
recovery of its entire $3.5 million ad damnum but only to the
$1,500,000 damages that was known to exist on October 10, 1990
when Dancor filed its federal action against Corrigan.
 Attached to Dancor's motion to reconsider were the
affidavits of John Kinsella, an assistant state's attorney for
DuPage County, who was assigned to criminally prosecute Arthur
Corrigan; and Daniel Frawley, Dancor's president. Kinsella
stated in his affidavit that on or about January 18, 1991, and
not before, his office obtained possession of Dancor's business
records, including all original bank checks, all computer
records, bank statements, expense reports and cash receipt
journals. Kinsella also stated that those records remained in
the possession of the state's attorney's office or in the
criminal court and would be returned after final sentencing of
Corrigan.
 The Frawley affidavit stated that in August 1990, when
Friedman and Dancor severed their business relationship, Friedman
failed to turn over Dancor's complete accounting records; that
Friedman turned over a portion of those records pursuant to a
deposition subpoena in the federal RICO action; that after
certain requests, Friedman turned over portions of Dancor's
records during June and July 1991; and that by August 1991,
Dancor acquired a large share of Dancor's own records by
inspecting and copying Dancor's "original records" which were in
the possession of the DuPage County State's Attorney's office. 
Frawley averred that it was not until August 1991 that Dancor
determined that it had been injured by the acts and/or omissions
of Friedman.
 On August 1, 1994, the court denied Dancor's motion to
reconsider and clarified its dismissal ruling stating that the
dismissal order extended to the entire $3,500,000 ad damnum
prayed for against Friedman.
 On appeal, Dancor argues that the trial court improperly
dismissed its action on the basis of the running of the statute
of limitations period provided in section 13-214.2 of the Code. 
Dancor contends that the limitations period was tolled under the
discovery rule and by Friedman's fraudulent concealment of the
cause of action against it. Dancor further argues that even if
the statute of limitations expired, it did so only with respect
to the claims relating to Corrigan's embezzlement of $1,500,000
and not with respect to the remaining $2,000,000 in damages
discovered by Dancor's accountants after October 10, 1990, the
date of filing of the federal action against Corrigan.
 As provided in section 13-214.2, an accounting malpractice
action must be commenced within two years from the time the
person bringing the action knew or should reasonably have known
of the act or omission. 735 ILCS 5/13-214.2 (West 1992). This
statutory provision has incorporated within it a discovery rule
which delays commencement of the statute of limitations until the
plaintiff knows or reasonably should have known of the injury and
that it may have been wrongfully caused. See Hermitage Corp. v.
Contractors Adjustment Co., 166 Ill. 2d 72, 651 N.E.2d 1132
(1995); Waters v. Reingold, 278 Ill. App. 3d 647, 663 N.E.2d 126
(1996); Jackson Jordan, Inc. v. Leydig, Voit & Mayer, 158 Ill. 2d
240, 633 N.E.2d 627 (1994). The effect of the discovery rule is
to postpone the starting of the limitations period. Knox College
v. Celotex Corp., 88 Ill. 2d 407, 430 N.E.2d 976 (1981). When a
plaintiff uses the discovery rule to delay commencement of the
statute of limitations, the burden is on the plaintiff to prove
the date of discovery. Hermitage, 166 Ill. 2d 72, 651 N.E.2d
1132.
 In the case at bar, Dancor argues that it did not know and
could not have reasonably known of Friedman's negligent conduct
and malpractice until it received a professional opinion to that
effect from Berger, Goldstein in August 1991. Dancor contends
that in a professional malpractice action, knowledge for purposes
of the discovery rule does not exist until a professional opinion
is rendered as to the deviation from the standard of care. We
disagree. The discovery rule has never been interpreted to delay
commencement of the statute of limitations until a person
acquires actual knowledge of negligent conduct. Rather, it has
been interpreted to delay commencement until the person has a
reasonable belief that the injury was caused by wrongful conduct
thereby creating an obligation to inquire further on that issue. 
As stated in Nolan v. Johns-Manville Asbestos, 85 Ill. 2d 161,
170-71, 421 N.E.2d 864, 868 (1981):
 "We wish to emphasize that the rule we announce is not
 the same as a rule which states that a cause of action
 accrues when a person knows or should know of both the
 injury and the defendants' negligent conduct. Not only
 is such a standard beyond the comprehension of the
 ordinary lay person to recognize, but it assumes a
 conclusion which must properly await legal
 determination. [Citation.] Moreover, if knowledge of
 negligent conduct were the standard, a party could wait
 to bring an action far beyond a reasonable time when
 sufficient notice has been received of a possible
 invasion of one's legally protected interests. (See
 Restatement (Second) of Torts sec. 7 (1965) (definition
 of an injury)). Also, such a rule would be contrary to
 the underlying purpose of statutes of limitations,
 which is to 'require the prosecution of a right of
 action within a reasonable time to prevent the loss or
 impairment of available evidence and to discourage
 delay in the bringing of claims.' [Citations.]
 We hold, therefore, that when a party knows or
 reasonably should know both that an injury has occurred
 and that it was wrongfully caused, the statute begins
 to run and the party is under an obligation to inquire
 further to determine whether an actionable wrong was
 committed. In that way, an injured person is not held
 to a standard of knowing the inherently unknowable
 [citation], yet once it reasonably appears that an
 injury was wrongfully caused, the party may not slumber
 on his rights."
 Accord Hermitage, 166 Ill. 2d 72, 651 N.E.2d 1132; Knox College
v. Celotex Corp., 88 Ill. 2d 407, 416, 430 N.E.2d 976, 980 (1981)
("[t]he term 'wrongfully caused' *** must be viewed as a general
or generic term, and not a term of art. *** [T]he term does not
connote knowledge of negligent conduct or knowledge of the
existence of a cause of action").
 Based upon Nolan and its progeny, we reject Dancor's
contention that the statute of limitations did not begin to run
until its new accountants rendered a professional opinion in
August 1991 that Friedman's acts and omissions deviated from the
standard of care. The discovery rule became operative and the
statute of limitations began to run on October 10, 1990 when
Dancor had enough information to put it on notice that it was
injured and that that injury may have been wrongfully caused by
Friedman. The facts are undisputed that on October 10, 1990,
Dancor had enough information to file a 35-page federal RICO
complaint against Corrigan alleging warehouse fraud and
embezzlement. See Hermitage Corp., 166 Ill. 2d 72, 651 N.E.2d
1132; Smith v. Cook County Hospital, 164 Ill. App. 3d 857, 518
N.E.2d 336 (1987) (point at which injured person becomes
possessed of sufficient information concerning its injury and
cause can be decided as a matter of law where facts are
undisputed and only one conclusion may be drawn from them). As
discussed above, that federal complaint contained 226 separate
and specific allegations of fraudulent check transactions,
allegations that contained information as to names of payees and
endorsers, recorded amounts and altered amounts, recorded reasons
for payments and actual reasons for payments and checks recorded
as void but which were actually cashed. That same information
was used by Dancor to support its allegations and charge of
malpractice in the instant case. Dancor charged Friedman, a
certified public accounting firm hired by Dancor to audit and
monitor its books and records, with the failure to properly audit
and monitor the same records and checks having the same payees
and endorsers, the same dates, the same altered or divergent
amounts and the same reasons.
 Based upon those records, Dancor unquestionably had
sufficient knowledge to cause it to inquire further of a possible
actionable wrong by Friedman in failing to detect the falsity of
the accounting entries made by Corrigan. This is especially true
here where the underlying federal complaint filed by Dancor
demonstrated that Dancor was aware in great detail of the
embezzlement scheme and the documentation supportive of that
scheme. It would make no sense to presume that the paper trail
that formed the basis for Dancor's federal action and its
detection of Corrigan's embezzlement scheme could not also
suffice to put Dancor on notice that Friedman was negligent in
failing to detect Corrigan's misconduct. While Dancor may not
have had full knowledge on October 10, 1990 that, in the opinion
of its expert, Friedmans' acts and omissions amounted to a breach
of the standard of care, it is clear that the knowledge Dancor
did possess at that time was sufficient to put it on notice of
Friedman's possible invasion of Dancor's legally protected
rights. See Nolan, 85 Ill. 2d at 171, 421 N.E.2d at 868. See
also Hermitage Corp., 166 Ill. 2d 72, 86-87, 651 N.E.2d 1132,
1139 (in action for negligent preparation of mechanic's lien,
under discovery rule, statute of limitations commences on date
when "plaintiffs were on notice *** that they had a problem with
the mechanics lien"). At that point, Dancor was required to
investigate and inquire further with its new accountants and
experts, Berger, Goldstein. See Nolan, 85 Ill. 2d 161, 421
N.E.2d 864 (obligation to inquire and pursue causes of action
eliminates delay in bringing claims, the very purpose of
limitations periods). Under the discovery rule provision of
section 13-214.2, Dancor had two years from October 10, 1990 to
make that inquiry and to file its cause of action against
Friedman before that action became time barred on October 10,
1992.
 Dancor next contends that the statute of limitations was
tolled by Friedman's fraudulent concealment of the cause of
action as evidenced by Friedman's failure to return Dancor's work
papers and records. Section 13-215 of the Code of Civil
Procedure provides in pertinent part:
 "[i]f a person liable to an action fraudulently
 conceals the cause of action, *** the action may be
 commenced at any time within 5 years after the person
 entitled to bring the same discovers that he or she has
 a cause of action, and not afterwards." 735 ILCS 5/13-
 215 (West 1992).
 The concealment of a cause of action sufficient to toll the
statute of limitations requires affirmative acts or
representations designed to prevent discovery of the cause of
action or to lull or induce a claimant into delaying the filing
of his claim. E.g., Chicago Park District v. Kenroy, Inc., 78
Ill. 2d 555, 402 N.E.2d 181 (1980); Foster v. Plaut, 252 Ill.
App. 3d 692, 625 N.E.2d 198 (1993); Smith, 164 Ill. App. 3d 857,
518 N.E.2d 336. The alleged acts or representations must in fact
prevent inquiry or discovery of the claim or lull or induce a
claimant into delaying the filing of his claim. Waters v.
Reingold, 278 Ill. App. 3d 647, 660, 663 N.E.2d 126, 136 (1996)
(fraudulent concealment allegation must be supported by "facts of
affirmative acts or misrepresentations by the defendant which
were designed to prevent and in fact did prevent the discovery of
the claim").
 Here, the submissions of the parties create a dispute as to
whether and when Friedman had returned all of Dancor's work
papers and records. However, even assuming Friedman failed to
return some of Dancor's records, Friedman's acts of omission did
not prevent Dancor from discovering its claim against Friedman. 
As noted above, at the time Dancor filed its federal RICO action
against Corrigan, in October 1990, Dancor had sufficient
knowledge of Corrigan's warehouse fraud and embezzlement scheme
and of the more than 200 fraudulent check transactions
orchestrated by Corrigan. The extensive and specific allegations
in the federal complaint show that Dancor possessed financial
records that revealed discrepancies between the check entries
made by Corrigan and the actual checks showing different payees,
endorsers, and amounts. Dancor's allegations in the federal
complaint also showed that Dancor possessed records that
contradicted the recorded reasons for the check payments and the
actual reasons for those payments. In fact, as stated above, the
financial information which Dancor relied upon to support its
lengthy and detailed allegations in the federal complaint serve
as support for Dancor's allegations in the instant complaint. If
Dancor was able to discern Corrigan's fraudulent scheme based
upon that financial information, it would be reasonable for
Dancor to question Friedman's inability to do so when Friedman,
as a certified public accounting firm was engaged in the business
of auditing and monitoring books, records, and checks kept in the
ordinary course of business.
 We further note that the fraudulent concealment statute does
not apply to a party who by ordinary care could have discovered
the concealed information. County Board of School Trustees v.
Association of Franciscan Fathers, 49 Ill. App. 3d 686, 364
N.E.2d 691 (1977) (no fraudulent concealment where report could
have been obtained from newspaper or by pursuing a motion to
produce); Nogle v. Nogle, 53 Ill. App. 2d 457, 465, 202 N.E.2d
683 (1964). See Smith, 164 Ill. App. 3d 857, 518 N.E.2d 336. 
Here, as discussed above, Dancor had served a deposition subpoena
upon John Kallergis, a partner at the Friedman firm, on October
26, 1990, in which it requested that Kallergis produce "all
documents related to Dancor, including, without limitation,
working papers, audits, financial statements, reports,
correspondence, and billing papers." Kallergis averred in his
affidavit filed in the instant case that, pursuant to his
understanding of the court's ruling in the federal case, he
produced all of Dancor's work papers with Friedman's marginal
notes deleted and did not produce Friedman's audit procedures,
checklists and internal memoranda. If Friedman had not fully
complied with that deposition subpoena, Dancor could have moved
for a court order mandating compliance and/or filed a rule to
show cause. In addition, Daniel Frawley, Dancor's president,
averred in his affidavit that by August 1991, Dancor had acquired
a large share of its records by inspecting and copying Dancor's
"original records" which were in the possession of the DuPage
County State's Attorney's office. Those records, however, had
been in the possession of the State's Attorney's office since
January 1991, according to the affidavit of John Kinsella, a
DuPage County assistant state's attorney. Thus, since Dancor,
through ordinary diligence, could have acquired the documents and
papers alleged to have been fraudulently concealed by Friedman,
Dancor cannot avail itself of the fraudulent concealment rule. 
See County Board of School Trustees, 49 Ill. App. 3d 686, 364
N.E.2d 691.
 Dancor's final argument on appeal is that the court
erroneously dismissed its entire claim totalling $3.5 million. 
Dancor contends that the statute of limitations expired only as
to the damages known to exist in October 1990, namely the $1.5
million embezzled by Corrigan, and not with respect to the
remaining $2 million in damages discovered after October 10,
1990, the date of filing of the federal RICO action against
Corrigan. Initially, we note that Dancor has not cited any
authority in support of this argument; and, as such, has waived
that argument on appeal. See 155 Ill. 2d R. 341(e)(7) (argument
shall contain reasons and citation of authorities); Bank of
Illinois v. Thweatt, 258 Ill. App. 3d 349, 630 N.E.2d 121 (1994).
 Notwithstanding this waiver, we further note that Dancor's
contention is without merit. As discussed above, the discovery
rule delays commencement of the applicable statute of limitations
period until the plaintiff knows or should have known of an
injury and that it may have been wrongfully caused. E.g.,
Hermitage, 166 Ill. 2d 72, 651 N.E.2d 1132. The mere fact that
the extent of injury is not immediately known or ascertainable
does not postpone the triggering of the statute of limitations. 
Golla v. General Motors Corp., 167 Ill. 2d 353, 657 N.E.2d 894
(1995). In Golla, which presented a similar issue, the plaintiff
brought a products liability action against the manufacturer of
her automobile almost four years after she had been injured in an
automobile collision. The defendant moved to dismiss asserting
that the plaintiff's action was barred under the applicable two-
year statute of limitations period (Ill. Rev. Stat. 1991, ch.
110, par. 13-202 now at 735 ILCS 5/13-202 (West 1994)). The
plaintiff, in reliance on the discovery rule, argued that,
although she was aware of her initial injury at the time of the
collision, she was unaware of the ultimate extent of her damages,
i.e., a latent injury that manifested itself thereafter. The
court rejected plaintiff's argument and barred her action
stating:
 "The plaintiff here does not claim that she was unaware
 of any injury at the time of the accident or that she
 was unaware of the causal connection between that
 injury and the allegedly defective automobile seat. 
 Rather, she claims that, at the time of her initial
 injury, she was unaware of the ultimate extent of
 damages she sustained. This court has never suggested
 that plaintiffs must know the full extent of their
 injuries before the statute of limitations is
 triggered." Golla, 167 Ill. 2d at 364, 657 N.E.2d at
 899-900.
 Here, Dancor, as the plaintiff in Golla, alleges that it did
not know of the full extent of its injuries in October 1990. 
However, on October 10, 1990, Dancor did know that it had
suffered an injury of some magnitude and was put on notice that
its injury may have been wrongfully caused by Friedman. As a
result, the statute of limitations began to run as to its entire
claim on October 10, 1990. See Golla, 167 Ill. 2d 353, 657
N.E.2d 894.
 For the foregoing reasons, the judgment of the circuit court
of Cook County is affirmed.
 Affirmed.
 McNUILTY and HOURIHANE, JJ., concur.